UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 (Subchapter V) |
| Roti Restaurants, LLC | ) | |
| Roti Restaurants Inc. | ) | |
| ROTI 300 West Adams, LLC | ) | Case No. 24-12410 |
| ROTI 1311 F Street LLC | ) | Hon. Judge Donald R. Cassling |
| ROTI 1629 K Street, LLC | ) | |
| ROTI 1747 Pennsylvania Ave LLC | ) | |
| ROTI Constitution Square LLC | ) | (Joint Administration Pending)[1] |
| ROTI Square 54, LLC | ) | |
| ROTI 30 North Dearborn LLC | ) | |
| | ) | |
| Debtors. | ) | |

---

## DECLARATION OF JUSTIN SEAMONDS
## IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS

---

I, Justin Seamonds, hereby declare as follows:

1.      I am the Chief Executive Officer (**"CEO"**) of Debtor Roti Restaurants Inc. (**"Roti Inc."**) and a member of its board of directors. Roti Inc., whose headquarters is located at 445 North Wells Street, Chicago, IL 60654, is the holding company for Debtor Roti Restaurants, LLC (**"Roti LLC"**), the principal operating company for the Debtors' fast-casual Mediterranean restaurant business, which comprises 19 leased restaurants in Illinois (mostly in Chicago), Minnesota, Maryland,

---

[1] The Debtors in these chapter 11 cases, the last four digits of their federal EIN number, and their case numbers are: Roti Restaurants, LLC (8307, Case No. 24-12410); Roti Restaurants Inc. (7804, Case No. 24-12412); ROTI 300 West Adams, LLC (8368, Case No. 24-12422); ROTI 1311 F Street LLC (7809, Case No. 24-12415); ROTI 1629 K Street, LLC (8057, Case No. 24-12416); ROTI 1747 Pennsylvania Avenue LLC (8680, Case No. 24-12418); ROTI Constitution Square LLC (7756, Case No. 24-12427); ROTI Square 54, LLC (0337, Case No. 24-12428); and ROTI 30 North Dearborn LLC (1546, Case No. 24-12425).

and Washington, D.C.[2] Seven of those restaurants are owned (and leased) through separate limited liability companies (also debtors herein), of which I am also the authorized representative. Those are ROTI 300 West Adams, LLC ("**West Adams**"); ROTI 1311 F Street LLC ("**F Street**"); ROTI 1629 K Street, LLC ("**K Street**"); ROTI 1747 Pennsylvania Avenue LLC ("**1747 Penn Ave**"); ROTI Constitution Square LLC ("**Constitution Square**"); ROTI Square 54, LLC ("**Square 54**"); and ROTI 30 North Dearborn LLC ("**North Dearborn**") (collectively, the "**Single Lease LLCs**"). In addition, Roti LLC, of which I am also the authorized representative, is the lessee for all restaurant locations other than the Single Lease LLCs. (Roti Inc., Roti LLC and the Single Lease LLCs are referred to herein collectively as "**Roti**" or the "**Debtors**").[3]

2.     I am knowledgeable and familiar with the Debtors' day-to-day operations, financial affairs, business affairs, and books and records.

3.     I make this declaration in support of the Debtors' petitions for relief under subchapter V of chapter 11 of the Bankruptcy Code, and the emergency motions filed by the Debtors on and immediately after the Petition Date requesting various forms of immediate relief that will allow the Debtors to transition into chapter 11 without disrupting their business operations (the "**First Day Motions**"). Unless otherwise stated, the facts set forth herein are based on my personal knowledge, upon records obtained by the Debtors in the ordinary course of business that I have reviewed, or upon information provided to me by the Debtors' attorneys or employees.

---

[2] Three restaurants located in New York and Texas were recently closed.
[3] The Single Lease LLCs and Roti LLC are parties to a Limited Liability Company Agreement, pursuant to which they agreed that Roti LLC would be their sole manager.

4.    I have been the CEO of Roti since February 2020 (just prior to the pandemic outbreak). Prior to joining Roti, I spent more than twenty years leading middle-market consumer businesses, including companies whose businesses were in new age beverages, cellular towers, furniture, and retail food. I consider myself a builder of enterprise value through growth and brand value enhancements.

## The Debtors' History

5.    Roti currently operates fast-casual Mediterranean restaurants in nineteen locations branded as "Roti Modern Mediterranean," "Roti Mediterranean Grill," "Roti Bowls. Salads. Pitas.", and "Roti" (collectively "**Roti**").

6.    Roti was founded in 2006 by three childhood friends and a fourth business partner who wanted to bring the regional spices, sauces, colors and flavors of the eastern mediterranean cuisine of the Levant region[4] to their current home in Chicago.

7.    The first Roti restaurant in Chicago, Illinois was a success, and the founders then focused on formalizing the growth of the business on a fast-casual model. Beginning in 2006, Roti enjoyed rapid growth and commercial success, and today has locations in Illinois, Minnesota, Maryland and the District of Columbia. As it grew, the company experimented with different flavor profiles, products, and influences which continued to reflect the culinary diversity of the Levant region.

---

[4] The Levant region is a geographical region that refers to an area in the Middle East which roughly corresponds to modern-day Lebanon, Jordan, Palestine, Israel, Syria, and other certain adjacent areas. *See* https://www.britannica.com/place/Levant.

8.    The COVID-19 pandemic changed the world and threw the hospitality industry into disarray. During the pandemic, Roti had to evolve and redefine its approach to packaging food, serving customers, selling digitally, and operating in the most healthy and safe manner possible. In addition, during that time, Roti negotiated rent deferral agreements with many of its landlords. Roti survived the initial challenges of the pandemic. However, unfortunately, many of the pandemic-era rent deferral agreements have now expired, leading to a significant increase in operational expenses which have been difficult to meet. In order to continue to compete effectively for a share of the public's appetite against very large, entrenched, well-located, digitally active food brands, it is necessary for Roti to engage in a further sale or financial restructuring of its lease and contract obligations, including the possibility of infusing significant new capital through equity, debt, or a sale, or some combination of these that Roti hopes to achieve through these chapter 11 cases.

**The Debtors' Business**

9.    Roti's fast-casual restaurants feature healthy and wholesome food from around the Mediterranean, and highlight the benefits of the Mediterranean Diet.[5] The restaurants use fresher and more mindfully sourced ingredients, including grass-fed steak, never frozen chicken, sustainably raised seafood, and family farmed cheeses and yogurt.

---

[5] The Mediterranean diet is a primarily plant-based eating plan that includes daily intake of whole grains, olive oil, fruits, vegetables, beans and other legumes, nuts, herbs, and spices. *See https://www.hsph.harvard.edu/nutritionsource/healthy-weight/diet-reviews/mediterranean-diet/#:~:text=The%20Mediterranean%20diet%20is%20a,nuts%2C%20herbs%2C%20and%20spices.*

10.   Like many other fast-casual restaurants, the Debtors faced significant challenges during the COVID-19 pandemic, and determined to permanently close several locations. After entering COVID with forty-two locations in six US cities, the Debtors determined to close a number of locations, and were then operating at a peak of 26 restaurants in early 2023.  After a few additional lease expiration closures in late 2023, as of January 2024, the Debtors closed three additional locations: Maiden Lane located in New York, New York; Preston Center located in Dallas, Texas; and Olive & McKinney located in Dallas, Texas, which reduced their open locations to the current nineteen.

11.   As further restructuring steps, in 2021, partly in response to the COVID-19 pandemic and partly to generally refresh the business, Roti shifted its menu focus from a "build-your-own" rice plates, salads, wraps, and pitas to a simpler assortment of suggested bowls, salads, and pitas. The décor in each of the restaurants was also updated to create more inviting, but familiar, environments for customers.

12.   I believe that chapter 11 will enable us to sell our business, or attract additional debt or equity financing in order to complete a financial restructuring through a chapter 11 plan of reorganization.

### The Debtors' Prospects for Reorganization

13.   Although the Debtors are currently facing financial challenges, I believe there is a strong possibility that restructuring tools made available by the Bankruptcy Code will lead to the Debtors' successful emergence from these chapter

11 cases, either through a sale of substantially all the business, or a plan of reorganization.

14.    As part of this strategy, earlier this year the Debtors sought potential purchasers and sources of capital through an investment banker. During the first quarter 2024, the banker reported that he sent solicitation materials to approximately 219 potential purchasers, of whom 32 executed confidentiality agreements in order to conduct diligence. However, no firm contracts or reasonable capital sources emerged.

15.    In addition to the efforts made above, the Debtors have for the last several months been in regular discussion and negotiations with a national restaurant company regarding a potential acquisition of 8 locations. At this writing we believe there remains a possibility that they will bid to become a stalking horse bidder for that group of restaurants. I also hope and expect that many of the potential purchasers contacted earlier this year will seek to become stalking horse bidders in the sale process described below, or will participate as bidders in the auction that the Debtors hope to conduct on an accelerated timeframe (as discussed further below) in late October.

## FIRST DAY MOTIONS

### Motion for Joint Administration

16.    By the Motion for Joint Administration, each of the Debtors requests that the Court enter an order authorizing the joint administration of the Chapter 11 Cases, the consolidation of the cases for procedural purposes, and for administrative

convenience authorizing the Debtors to submit a joint (but not substantively consolidated) chapter 11 plan.

17. Because the issues faced by each of the Debtors are generally applicable to all of them, the motions, applications, hearings, and orders filed and entered in the Chapter 11 Cases will likely affect each and all of the Debtors. The Debtors submit that joint administration is in the best interest of each of the Debtors' estates and will ease the administrative burden on their creditors, this Court, and other interested parties.

### Motion for Consolidation of Creditor Matrix and List of Top 30 Unsecured Creditors

18. Pursuant to the Motion for Consolidation of Creditor Matrix, the Debtors request permission to serve a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor; and (b) authorizing the debtors to redact current and former employee home address information from the Debtors' schedules of assets and liabilities and any related affidavits of service.

19. Because many of the Debtors' creditors may be shared amongst the Debtors, the Debtors request authority to file a single, consolidated creditor matrix and a single, consolidated list of their 30 largest general unsecured creditors in these Cases (collectively, the "**Consolidated Lists**"). Allowing the Debtors to file the Consolidated Lists will help alleviate administrative burdens, costs, and the possibility of duplicative service on the Debtors.

20. Additionally, as more specifically discussed in the motion, the motion seeks approval to redact employee home address information from Debtors' schedules, in order to mitigate the risks of identity theft, and because there is no clear benefit of such publication in these Cases.

## Motion for Leave to Exceed Page Limit

21. Pursuant to the Motion for Leave to Exceed Page Limit, the Debtors respectfully request the Court to grant them leave to file certain first-day pleadings exceeding the page limit set forth in Local Rule 5005-3(D).

22. Though the Debtors have made every effort to minimize the length of the filings, due to the complexity of the Debtors' corporate structure and the large number of Debtors in these Cases, the Debtors submit it is necessary that their Cash Management Motion, Motion for Sale, and this Declaration exceed the limit established by Local Rule 5005-3(D) not only in order to fully address Debtors' requests, but also to provide the kind of significant background information that is customary to advise the Court on the Debtors' recent history and need for bankruptcy protection.

## Cash Collateral Motion

23. Pursuant to the emergency Cash Collateral Motion, the Debtors request permission to use their cash, which cash includes cash on hand and anticipated revenues generated from the Debtors' business operations, to continue operating their businesses and to fund the administration of these Chapter 11 Cases. The Debtors intend to use their cash to pay expenses relating to rent, payroll, utilities,

professional services, insurance, and maintenance and repairs. I believe that if the Debtors are not authorized to use their cash, the Debtors' estates would suffer immediate and irreparable harm to the detriment of the Debtors, their creditors, estates and stakeholders.

24.    The Debtors believe that their cash on hand and income generated from their business operations are encumbered by pre-petition secured lenders identified as the Mats A. Lederhausen 2000 Trust, QTH Fund LLC, and QVIDTVM Inc. (the "**Lenders**").

25.    The Debtors also believe that their cash and any collateral pledged to the Lenders is not likely to diminish over the first nearly 90 days of these cases. With the assistance of our proposed financial advisors, Harney Partners, I have prepared the Roti Cash Flow Projections annexed hereto as Exhibit A.

26.    In order to adequately protect the Lenders' security interest in the Cash Collateral from on and after the date of the filing of the Chapter 11 Cases, the Debtors propose to provide the Lenders with first position post-petition replacement liens on all personal property of the Debtors (including cash) to the same extent as the liens the Lenders assert against the Debtors pre-petition, as well as the proceeds of any lease assignments, with a reservation of rights to determine the allowed extent and amount of such secured claims at a later time.

27.    For these reasons, by its Emergency Motion for Interim and Final Orders (1) Authorizing the Use of Cash Collateral, (2) Granting Adequate Protection, and (3) Scheduling a Final Hearing on Final Authorization of Use of Cash Collateral,

the Debtors seek authority to continue to use its cash collateral to meet all of its operational and chapter 11 expenses in these cases.

## Employee Wage and Benefits Motion

28.     To operate, maintain, and service the restaurants, the Debtors have a workforce consisting of 37 full-time salaried and exempt employees, 65 full-time hourly employees, and 125 part-time hourly employees (collectively, the "**Employees**"). These employees include corporate staff, restaurant location managers, hourly shift leads and hourly team members.

29.     Under the Debtors' corporate structure, Roti LLC employs and compensates the Employees. Roti LLC receives the funds necessary to compensate employees and the costs of benefit programs from income from each of its restaurants.

30.     The Employees are essential to meet the Debtors' ongoing business needs, including managing and operating the restaurants. A failure to pay Employees could lead to their departures, which would imperil the Debtors' ability to operate their businesses efficiently, and could lead to closures of Restaurants that the Debtors believe are essential to a successful sale or restructuring. Without the Employees, the Debtors' ability to reorganize under chapter 11 of the Bankruptcy Code would be greatly impaired, to the detriment of the Debtors' creditors and their respective estates.

31.     Because the Debtors rely on the talent and skills of the Employees, the Employees similarly rely upon the Debtors to support their livelihoods. Based on my interactions with Employees, I believe that the employees cannot, and will not, work

10

without timely compensation. This is a critical issue in the restaurant business where average annual restaurant industry turnover rate is 79.6% over the past ten years. *See* https://pos.toasttab.com/blog/on-the-line/restaurant-turnover-rate#:~:text=Using %20the%20most%20recent%20data,over%20the%20past%2010%20years. In fact, turnover at Roti has averaged higher than 80% in recent years.

32.    For these reasons, as described more fully in the Debtors' Emergency Motion for Authority to (a) Pay Prepetition Employee Obligations; (2) Continue Administering Employee Benefit Plans; and (3) Direct Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations, the Debtors seek approval of payments which will assure that its Employees' compensation and benefits are and remain current.

**The Debtors' Motion to Approve Key Employee Incentive Plans**

33.    Although not being filed as an emergency motion, the Debtors are also filing contemporaneously with their emergency motions a Motion for an Order Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code Authorizing (I) Implementation of Key Employee Incentive Plans for Certain Employees, and (II) Payment of any Obligations Arising Thereunder as Administrative Expenses, which relies on many of the same premises as the Employee Wages and Benefit Motion discussed above. For the same reasons, and because these chapter 11 cases are intended to proceed to sales or chapter 11 plan confirmation on an accelerated basis, it is of critical importance that the Debtors maintain their workforce through the conclusion of this process. This is especially important because the Debtors'

11

Employees cannot today know whether the disposition of these cases will result in their continued employment or not.

34.    The Debtors therefore seek Court authority (on ordinary notice) to implement two Key Employee Incentive Plans ("**KEIPs**"). Under the first KEIP, to be applied to Debtors' corporate team ("**Kitchen Crew**"), 11 corporate employees would be paid bonus compensation of one week's average pay, for each week that (a) the Debtors' Prime Costs (described below) are 40% or less, and (b) the Debtors eliminate an additional $15,000 in weekly controllable expenses (above and beyond cost of goods sold and hourly labor expenses).

35.    The Prime Cost percentage consists of the sum of (a) the cost of goods sold and (b) hourly labor costs, both as a percentage of net sales. It is an important data point that Roti tracks weekly, and I believe it is the most reliable weekly indicator of restaurant performance across Roti's locations and markets. For 2024 year to date it has averaged approximately 45%. If Roti is able to use the proposed KEIP to motivate its Kitchen Crew to bring the Prime Cost down to 40%, and the team reduces an identified portion of weekly controllable expenses, assuming weekly sales revenue of $500,000, an additional $37,000 per week would be added to profitablity. The aggregate of Kitchen Crew compensation bonus that would be paid under the KEIP in such event is $18,000 per week. Thus, the KEIP will not only help to motivate Roti's Kitchen Crew employees, but if successful such bonuses would only be earned during weeks in which the net benefit to the Debtors, after payment of the bonuses, would be an additional approximately $20,000 in gross profit.

36.    Importantly, to assure that the Kitchen Crew employees continue to support the Debtors and these efforts during these chapter 11 cases, the proposed KEIP provides that the bonuses will not be paid until the earlier of the following Milestone events: consummation of the acquisition of all or substantially all of Debtors' restaurant locations, consummation of a chapter 11 plan, and termination by Roti of the particular employee's position for reasons other than performance. This deferral of incentive payment will also allow the Debtors to retain 100% of the cash improvement until later in the restructuring process when the Debtors' prospects are likely to have improved substantially or resolved.

37.    The second KEIP applies to me, and is based on a program that was approved by Roti's Board of Directors in March 2024. Working closely with Debtors' counsel, my KEIP is designed to pay bonus compensation to me in the event I am able to meet the challenge of consummating substantial restaurant location sales or a confirmed chapter 11 plan of reorganization on an accelerated timeframe, while I continue to be engaged full-time in the day-to-day management and operation of the Debtors' businesses. Our lead financial officer left for another position last January, and has not been replaced. We do not have a senior-level corporate operational leader, and only an administrative team of seven for a restaurant chain of 19 locations, which is very small relative to industry norms.

**The Debtors' Bank and Cash Management System Motion**

38.    As discussed herein, the Debtors collectively operate administratively as a single enterprise. As such, the Debtors maintain a centralized cash management

13

system (the "**Cash Management System**"), described in more detail in the Debtors'
Emergency Motion for Authority to (1) Maintain Existing Bank Accounts; (2)
Continue Using Existing Cash Management Systems; (3) Continue Using Existing
Business Forms; (4) Modify Deposit Requirements Pursuant to 11 U.S.C. § 345(b);
and for (5) other Related Relief, which they seek Court authority to continue ("**Cash
Management Motion**"). The Debtors' Cash Management System is comparable to
cash management systems used by similarly situated companies, to manage its cash
in a cost-effective and efficient manner.

39.    The Cash Management System affects all aspects of the Debtors'
business operations, and is critical to the integrated management of the Debtors'
financial affairs. The majority of the Debtors' business transactions are conducted
electronically and tied directly to the Debtors' various depository accounts located at
Eagle Bank; JPMorgan Chase Bank, NA; Wells Fargo Bank, NA; PNC Bank, NA; and
Manufacturers and Traders Trust Company d/b/a M&T Bank (the "**Bank
Accounts**"). Additionally, the Cash Management System is integrated directly with
the Debtors' accounting systems to track and receive information regarding the
Debtors' business, including tracking and accounting for receipts from specific
sources, projecting future revenues and income, and managing employee, vendor, and
customer payments and receipts. The Debtors need to be able to continue operating
their respective businesses in the ordinary course under the Cash Management
System. Requiring changes to the existing system would likely be complex, time-

consuming, and expensive, and could also disrupt regular business activities at a time when continuing operations is so critical to the Debtors' ability to reorganize.

40.    I believe that given the nature of the Debtor's business, any disruption to the Cash Management System would have an immediate adverse effect on its business and operations to the detriment of its estate and numerous stakeholders. I believe further that approval of the Cash Management Motion would minimize the disruption caused by these Cases and maximize the value of the Debtors' estates.

### The Debtors' Utility Motion

41.    The Debtors receive utility services provided by various utility companies, which include, but are not necessarily limited to, electrical power, natural gas, water, sewer, waste hauling, telephone services, security services, and internet services ("**Utility Services**").

42.    The Debtors cannot operate without the Utility Services, and any disruption of any of the Utility Services would cause irreparable damage to the Debtors' ongoing business operations, especially to the restaurants, and estates. Cessation of the Debtors' business operations would also negatively impact the Debtors' customers and the Debtors' employees. For these reasons, the Debtor must ensure the continued provision of the Utility Services.

43.    As described more fully in the Debtors' Emergency Motion for Interim and Final Orders Pursuant to Sections 366 and 105 of the United States Bankruptcy Code (1) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services to the Debtors; (2) Deeming Utility Providers Adequately Assured of Future

Performance; and (3) Establishing Procedures to Determine Requests for Additional Adequate Assurance of Payment (the "**Utilities Motion**"), the Debtors incur, on average, utility charges of approximately $92,000 per month, in the aggregate, for all Utility Services over the past twelve months.

44.     The Debtors have a strong payment history with their Utilities with few defaults or arrearages on any of the Debtor's undisputed utility service invoices, other than potential payment interruptions caused by the commencement of this Case, and seek a reasonable process for continuing payments and providing appropriate assurances.

45.     Pursuant to the Utilities Motion, to avoid interruption of services to comply with applicable provisions of the Bankruptcy Code, the Debtors propose to provide assurance of payment to the Debtors' utility providers by funding a segregated and dedicated bank account into which a deposit of approximately one-third ($30,000) of the aggregate average monthly charges for the benefit of the utility providers will be made, and by establishing a procedure that requires the utility providers to make any objection to the Debtors' offers of adequate assurance by a deadline established within the first thirty (30) days of these Chapter 11 Cases.

### The Motion for 60-Day Extension of Time for the Debtors' Performance of Lease Obligations

46.     The Debtors are party to (a) 21 non-residential real property leases for restaurants located in four states, two locations of which have been recently closed, and (b) additional leases for the corporate headquarters, and a storage unit (the

"**Leases**"). The Debtors' lease obligations currently represent a significant strain on the Debtors' liquidity.

47.    The Debtors' obligations under the Leases are approximately $350,000 each month, meaning that approximately $700,000 will become due and payable during the requested two-month Extension Period. Pursuant to the Debtors' Emergency Motion for Entry of Order Extending for 60 Days the Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases ("**Motion for Extension of Time for the Debtor's Performance of Lease Obligations**"), the Debtors request that the obligations arising under the Leases during the 60 days after the Petition Date be extended through and including the 60th day after the Petition Date (the "**Extension Period**").

48.    The Debtors are also requesting by this motion, pursuant to Section 105(a), that all motions, applications, actions, or pleadings filed in these cases seeking to (a) lift the automatic stay as a result of the Debtors' failure to perform any 60-Day lease obligations, (b) compel the Debtors' performance of any 60-Day lease obligation (including payment of rent), or (c) compel rejection, assumption, or assignment of any unexpired nonresidential real property leases with the Debtors, in each case, be automatically stayed during the Extension Period unless otherwise agreed by the Debtors.

49.    I believe that the benefit to the Debtors' estates in granting the requested extension, and the lack of undue prejudice to the affected Landlords, are each sufficient cause to approve the Extension Period. The Debtors stand to derive

significant benefit from the temporary extension, as the temporary extension will allow the Debtors to access much needed capital and maintain operational flexibility while they prepare for and pursue accelerated sale and restructuring opportunities.

### The Sale Motion

50.     The Debtors are also submitting their emergency Motion to (I) Approve Bidding Procedures for the Sale of Assets Pursuant to 11 U.S.C. §§ 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 and (II) for Waiver of the 14-Day Stay Under Bankruptcy Rule 6004 ("**Sale Motion**"), seeking entry of an order approving bid procedures for the sale of substantially all of the Debtors' assets. Pursuant to the Sale Motion, the Debtors seek the entry of an order immediately authorizing certain bidding procedures as follows:

a. Approving the bidding procedures in connection with the sale of the Debtors' assets, including, among other things, setting a stalking horse bid deadline of September 20, 2024, and a due diligence and qualified bid deadline of October 4, 2024, prescribing the requirements of a qualified bid, and authorizing the Debtors to designate one or more qualified bidders as a "stalking horse" for the Assets and to provide certain bid protections to such stalking horse bidders;

b. Authorizing the Debtors to modify the proposed bidding procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process or impose additional terms and conditions on the sale of the assets, or any portion thereof, including,

without limitation: (a) extending the deadlines set forth in the proposed bidding procedures; (b) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the auction (*e.g.*, the amount of time to make subsequent overbids, whether a non-conforming bid constitutes a qualified bid); and (c) rejecting any or all bids or qualified bids, provided that such modifications and/or additional terms and conditions are not materially inconsistent with the provisions of the order approving the proposed bidding procedures; and

c.  Setting an auction for October 21, 2024, and a sale hearing for October 22, 2024.

51.    I submit that the proposed bidding procedures will provide a fair, open, and appropriate process for soliciting and selecting bids from all interested and qualified parties on an accelerated basis that will culminate with the selection of the highest and best bid(s) for the Debtors' assets.

### Declaration

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 26th day of August, 2024.

Justin Seamonds

# EXHIBIT A

| Period | P08 2024 | P09 2024 | P09 2024 | P09 2024 | P09 2024 | P09 2024 | P10 2024 | P10 2024 | P10 2024 | P10 2024 | P11 2024 | P11 2024 | P11 2024 | P11 2024 | P12 2024 | P12 2024 | P12 2024 | P12 2024 | P12 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week** | 2024 P08 W4 | 2024 P09 W1 | 2024 P09 W2 | 2024 P09 W3 | 2024 P09 W4 | 2024 P09 W5 | 2024 P10 W1 | 2024 P10 W2 | 2024 P10 W3 | 2024 P10 W4 | 2024 P11 W1 | 2024 P11 W2 | 2024 P11 W3 | 2024 P11 W4 | 2024 P12 W1 | 2024 P12 W2 | 2024 P12 W3 | 2024 P12 W4 | 2024 P11 W5 |
| **Calendar Start Date** | 8/19/2024 | 8/26/2024 | 9/2/2024 | 9/9/2024 | 9/16/2024 | 9/23/2024 | 9/30/2024 | 10/7/2024 | 10/14/2024 | 10/21/2024 | 10/28/2024 | 11/4/2024 | 11/11/2024 | 11/18/2024 | 11/25/2024 | 12/2/2024 | 12/9/2024 | 12/16/2024 | 12/23/2024 |
| **Beginning Bank Balance** | 336,106 | 267,049 | 112,649 | 224,642 | 161,697 | 421,530 | 349,233 | 555,514 | 417,526 | 642,071 | 371,674 | 471,703 | 64,278 | 292,767 | 8,364 | 59,026 | (306,838) | (70,936) | (302,703) |
| Stores Selling | | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| Net Sales | 457,640 | 477,563 | 438,957 | 506,813 | 549,374 | 549,328 | 494,064 | 506,580 | 525,608 | 504,495 | 497,043 | 491,595 | 503,933 | 446,259 | 302,743 | 467,983 | 452,885 | 311,857 | 170,769 |
| SSS vs PY | (7.0%) | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 100.0% | (33.0%) | 0.0% | 0.0% | 0.0% | 0.0% |
| Other Rev/Discounts | 4,576 | 4,776 | 4,390 | 5,068 | 5,494 | 5,493 | 4,941 | 5,066 | 5,256 | 5,045 | 4,970 | 4,916 | 5,039 | 4,463 | 3,027 | 4,680 | 4,529 | 3,119 | 1,708 |
| Total Revenue | 462,217 | 482,339 | 443,346 | 511,881 | 554,868 | 554,822 | 499,005 | 511,646 | 530,864 | 509,540 | 502,014 | 496,511 | 508,972 | 450,722 | 305,770 | 472,663 | 457,414 | 314,975 | 172,477 |
| Food Cost | 105,286 | 111,136 | 99,770 | 104,113 | 95,697 | 110,490 | 119,769 | 119,758 | 107,710 | 110,439 | 114,587 | 109,984 | 108,360 | 107,172 | 109,862 | 97,288 | 66,001 | 102,024 | 98,733 |
| % of Net Sales | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% | 21.8% |
| Paper Cost | 18,608 | 19,642 | 17,633 | 18,401 | 16,913 | 19,528 | 21,168 | 21,166 | 19,037 | 19,519 | 20,252 | 19,438 | 19,151 | 18,941 | 19,417 | 17,195 | 11,665 | 18,032 | 17,450 |
| % of Net Sales | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% |
| Total COGS | 123,894 | 130,778 | 117,403 | 122,514 | 112,610 | 130,018 | 140,936 | 140,924 | 126,747 | 129,958 | 134,839 | 129,423 | 127,511 | 126,114 | 129,279 | 114,483 | 77,665 | 120,056 | 116,183 |
| % of Net Sales | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% | 25.7% |
| Hourly Labor Expense | | 170,991 | | 161,995 | | 186,681 | | 184,420 | | 182,439 | | 177,022 | | 175,960 | | 132,386 | | 162,763 | |
| % of Net Sales | | 17.5% | | 17.5% | | 17.5% | | 17.5% | | 17.5% | | 17.5% | | 17.5% | | 17.5% | | 17.5% | |
| Salaried Labor Expense | | 65,000 | | 65,000 | | 65,000 | | 65,000 | | 65,000 | | 65,000 | | 65,000 | | 65,000 | | 65,000 | |
| Other Labor Expense | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | |
| GM Bonus Paid | | | | | | | | 25,000 | | 20,000 | | 25,000 | | | | 25,000 | | | |
| Variable OpEx | 59,493 | 62,083 | 57,064 | 60,818 | 65,925 | 65,919 | 59,288 | 60,790 | 63,073 | 60,539 | 59,645 | 58,991 | 60,472 | 53,551 | 36,329 | 56,158 | 54,346 | 37,423 | 20,492 |
| % of Net Sales | 13.0% | 13.0% | 13.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Fixed OpEx | 50,371 | 50,371 | 50,371 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| Occupancy | | | | | | | | | | | | 275,000 | | | | 275,000 | | | |
| **Restaurant Cash Flow** | 228,458 | 3,116 | 218,508 | 56,555 | 331,333 | 62,203 | 253,781 | (9,488) | 296,044 | 6,603 | 262,529 | (278,925) | 275,989 | (14,903) | 95,162 | (240,364) | 280,402 | (115,267) | (9,199) |
| **Personnel** | | | | | | | | | | | | | | | | | | | |
| Kitchen Crew | | 72,000 | | 72,000 | | 72,000 | | 72,000 | | 72,000 | | 72,000 | | 72,000 | | 72,000 | | 72,000 | |
| TD Bonus | | | | | | | | 9,000 | | | | 9,000 | | | | 9,000 | | | |
| KC Bonus | | | | | | | | | | 7,500 | | | | | | | | | |
| Other Labor Expense | 2,000 | | | | | | | | | | | | | | | | | | |
| Marketing | 8,208 | 8,208 | 8,208 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Other G&A | 50,000 | 50,000 | 50,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| **G&A Cash Flow** | (60,208) | (130,208) | (58,208) | (118,000) | (46,000) | (118,000) | (46,000) | (127,000) | (46,000) | (125,500) | (46,000) | (127,000) | (46,000) | (118,000) | (43,000) | (124,000) | (43,000) | (115,000) | (43,000) |
| Restaurant CapEx | 7,308 | 7,308 | 7,308 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Technology CapEx | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **CapEx Cash Flow** | (7,308) | (7,308) | (7,308) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) |
| **Net Recurring Cash Flow** | 160,943 | (134,400) | 152,993 | (62,945) | 283,833 | (57,297) | 206,281 | (137,988) | 248,544 | (120,397) | 215,029 | (407,425) | 228,489 | (134,403) | 50,662 | (365,864) | 235,902 | (231,767) | (53,699) |
| Deferred Payroll Tax | | | | | | | | | | | | | | | | | | | |
| Insurance Installment | | | | | (24,000) | | | | | (24,000) | | | | | | | | | |
| Other/Unexplained | | | | | | | | | | | | | | | | | | | |
| **Total Operating Cash Flow** | 160,943 | (134,400) | 152,993 | (62,945) | 259,833 | (57,297) | 206,281 | (137,988) | 248,544 | (144,397) | 215,029 | (407,425) | 228,489 | (134,403) | 50,662 | (365,864) | 235,902 | (231,767) | (53,699) |
| **Other Items** | | | | | | | | | | | | | | | | | | | |
| Bridge Loan Proceeds | | | | | | | | | | | | | | | | | | | |
| Eqipment Salvage | | | | | | | | | | | | | | | | | | | |
| Sysco New Cust. Incentive | | | | | | | | | | | | | | | | | | | |
| Legal | (40,000) | | | | | | | | | | (50,000) | | | | | | | | |
| Banker Costs | (15,000) | | | | | (15,000) | | | | | (15,000) | | | | | | | | |
| Financial Advisor | (40,000) | | | | | | | | | | (50,000) | | | | | | | | |
| Sales Tax | (135,000) | | (11,000) | | | | | | | (150,000) | | | | (150,000) | | | | | |
| Utility Deposit | | (20,000) | (30,000) | | | | | | | | | | | | | | | | |
| **Total Cashflow** | (69,057) | (154,400) | 111,993 | (62,945) | 259,833 | (72,297) | 206,281 | (137,988) | 248,544 | (294,397) | 100,029 | (407,425) | 228,489 | (284,403) | 50,662 | (365,864) | 235,902 | (231,767) | (53,699) |